Good morning. Good morning. May it please the court, my name is Gloria Hong and I, along with Ken Ansah, sitting at council table, represent the appellant Ricky Beaver. I'd like to reserve three minutes for rebuttal, please. The issue before the court today is whether or not the defendants are entitled to qualified immunity. And the district court has already held that two of the tasings were considered excessive force. In fact, the district court held that in light of Mr. Beaver's failure to comply with Officer Laird's multiple commands, his altered state of mind, his statement, I can't, a reasonable officer would have concluded that Mr. Beaver was unable to comply with the commands given and that his refusal to do so was at least in part involuntary. But he also said I can. No, actually, your honor, he did not. The witness that testified, he testified at trial that he never did say, he never heard Mr. Beaver say I can. It's in a footnote in the excerpt of record where Judge Donahue addressed that issue. It's in the statement that was provided in the supplemental excerpt of record, it did say that, that Melvin Smith said he heard Mr. Beaver say I can. But at trial he testified that no, that's incorrect. I never heard him say I can. I heard him repeatedly say I can't. Did Mr. Beaver suffer any injuries from this? Yes, he did. What did he suffer? He had suffered wrist injuries and knee injuries from the fall as well as ankle injuries. He fell from the first three tasings that were not considered excessive. He fell from the first tasing, yes, your honor. Did he suffer any injuries from the last two that you're complaining about? We have evidence in the record that the doctor said he had suffered injuries. I believe that they are somewhat related to the other tasings, your honor. I take it you can't really trace them to the last two? That's a difficulty, yes, your honor. And does he remember the event at all? He does not. They're trying to arrest him and they use the tasers. He suffers no injury that we can point to from the last two. He doesn't remember it. What are they supposed to do when he won't acquiesce in being arrested? What would you have the police do? Your honor, of course we're not to second-guess the officers. However, as Judge Donahue addressed in his order, they could have gone in. There were two officers available at the time when Mr. Beaver was tased the fourth and fifth times. The officers could have communicated to have her go in earlier and handcuff the individual. Like a physical fistfight with him over it? There was no fistfight, your honor. No, I know. That's because they tased him. But I'm saying if they don't tase him, how are they supposed to put the handcuffs on him? They were there to go in and handcuff him. In this case, your honor, they didn't have to tase him. When they went in to handcuff him, his arms, they were able to get his arms. Even when he tensed, they were able to get him in handcuffs, even in this case without a fight. That's after they tased him? Yes, your honor. Before they tased him, they couldn't put the handcuffs on him? Well, your honor, we're not challenging the first tasing. What I'm saying is I don't understand what the police are supposed to do. They have him on the ground. He won't release his arms. So they can either fight with him and get his arms, or they can wait until he decides he's going to put the handcuffs on, or they can tase him, get him to release his arms and handcuff him, and in this case, that's what they did. He suffered no injury, and he doesn't even remember it. I'm trying to figure out what exactly the police did wrong, or what else they should have done. Well, the police should have gone in and apprehended him in the sense, I understand your concern, your honor, but in this case, Officer Kasher could have gone in after the third tasing and gone in and apprehended the official. So you're saying they physically should have basically had a fight with him and encountered him and put the hand, you know, forced his arms back. Well, your honor, I guess the assumption you're making is that there would be a fight, and Judge Donahue here, reviewing the facts that he had seen, he was involuntary, he was in sort of a dazed, disoriented state of mind. He was saying, I can't, that there's not really any evidence, and actually the judge didn't accept the argument that there was evidence that he would fight, that there was no evidence that he would have fought. They didn't in fact try, right? They didn't try to put the handcuffs on. They didn't try to put the handcuffs on. I mean, actually, in that case that I just recently submitted, the Oliver case that was just decided by the District of Florida, it was a similar situation, and then the court found that it was excessive because there were two officers on site and neither one of them attempted to go in when they could have. What case is that? That's the Oliver v. City of Toledo, Orlando. And when was that decided? That was decided in 2008 for a conduct that occurred in May of 2004. Okay, so this event here happened in 2004, so this case wasn't available to the police officers at the time. This case was not available, but other cases were available that should have and would have put a reasonable officer on notice that this conduct was unlawful, Your Honor. The cases you're talking about are where you've got a compliant arrestee, somebody who's already complied or whatever and is tased. I mean, I don't see any case that you've cited where it's a noncompliant arrestee who continues to resist arrest or attempts to flee, and they tase him, and that's unreasonable. Well, in this case, Your Honor, I guess it depends on how you define it. It's not necessarily a compliant versus noncompliant. It's about whether or not a person actively resisted arrest or whether they were an immediate threat to the officers or whether they were unarmed or armed. In all these cases that I'm citing, Your Honor, they were not considered a threat. They said they don't know for sure whether he was armed. Yes, but the evidence shows, I mean, the record's clear that the dispatcher had told them that he was not armed. He was wearing a T-shirt and shorts. His arms were clearly visible to the officers, both officers, at the entire time of the arrest. He never reached for his waistband, and at the end they found that there were no weapons on him. So there was really no reasonable basis for them to believe he was armed. The problem with this case is that we don't have a transcript. Why is that? Why did you appeal it this way? Well, in all honesty, Your Honor, the issue of whether or not the force was excessive is not before this Court, so we did not believe. You're talking a lot of details, and the details matter, and we don't have the details. We only have some fairly summary of narrative findings, and that's it. We believe the details, the judge's order provides ample detail of the evidence that was provided to it. Can I ask you a question, for example, about the assertion that he and you just gave me a bunch of facts about what the dispatcher said and so on. Are those in the judge's opinion? All of those are in the judge's opinion, and I point you to each one of those issues, Your Honor. In the judge's opinion, it says that the dispatcher indicated that he was not armed. In the judge's opinion, it states that he was wearing a T-shirt and shorts. In the judge's opinion, in a footnote, he discusses specifically the issue of whether or not there was a reasonable belief that Mr. Bieber was armed or not. And in that footnote, he discusses the fact that he discusses each of the facts that, for instance, he was unarmed. I mean, he was the dispatch issue. Your position is that we can review these very fact-specific issues just on a set of bare findings with no knowledge of what was in the transcript? I believe you can, Your Honor, because it's not fair. Have you ever seen a case done that way? I'm sorry? Have you ever seen a case done that way? I don't know that I've seen a case done that way. No summary judgment motions are decided on that. Judge, but that's the whole point. This was after a trial, and we don't have the trial. I believe the order provides ample information and evidence. And not only that, Your Honor, we did not submit a transcript, but the appellee also did not submit a transcript in this issue. So I don't know that the issue – I mean, I don't think the issue is necessarily that any of the facts were disputed. Okay. Thank you, Ms. Hong. You wanted to reserve some time for rebuttal, so you have two minutes left. Thank you, Your Honor. Thank you. Morning. Morning, Your Honor. My name is Bob Christie. I'm the attorney for the respondents in this case. I'd like to speak to a couple of the questions that the court posed because I think the answers are quite clear. To your point, Your Honor, there is a footnote. It's footnote 5 in the memorandum decision on this question of, I can and I can't. And what the judge noted was that a contemporaneous statement prepared by this individual at the time reflected both of those comments and also reflects that he could not recall a trial. He made a finding, right? He made a finding. Yes. Which is that he found Mr. Beaver repeatedly said, I can't. So that's the finding, and that's the record that we're proceeding on. I was really just speaking to what the record was in correcting her statement. It doesn't matter, though. I mean, there's a finding. And this is sort of the opposite of the other problem. Here we have a finding that that was true. That's what happened. I'll move on to other issues. The standard of review in this case is one of de novo review, and the court is correct. There is no record, and all that you can look at to determine what was really only at issue in that are the last two tasing applications is what we see in Judge Donahue's decision. And there is an interesting decision which we cite to the court, the Ninth Circuit case of Thompson versus Marr, M-A-H-R-E, at 110 F3rd 716, that makes it clear that in looking at de novo review in this situation, we are entitled to have all the evidence construed in a light most favorable to the defendants. Judge Silverman, you're right on the money in this case. This is a case about 37 seconds. That's the length of time that we're talking about with respect to the assessment and application of the two final taser applications. And this is in the context of a case where a court has ruled as a matter of law that the first three taser applications were appropriate, were lawful uses of force. The situation that changed in that last 37 seconds is minor at best. We have a second officer, a female officer, that arrives on the scene. We have a combated suspect who attempted to flee. This gentleman is 6 foot 300 pounds. He is noncommunicative with the officers. When he was first spotted, he has veins bulging at his neck. He looked at the officer, and it looked like he was looking straight through him. This is not a calm individual. In fact, it's someone who had just committed a daylight burglary of a residence, an occupied residence. So this is a high-risk situation by any measure. What changed in the last 37 seconds, according to Judge Donahue, is that a second officer arrived on the scene. And you asked the ultimate question. What are the officers supposed to do? Judge Donahue poses that, and he suggests perhaps that appropriate uses of force at that time may have been a baton or pepper spray. Now, there was testimony about the use of the baton. The use of the baton is a strike weapon which, without question, would have seriously injured Mr. Beaver. And the record is also clear, and Judge Donahue found, all of the injuries, which was a scrape to the eye. Did you cross-appeal on the finding of constitutional violation? No, we did not, Your Honor. So why are we talking about it? What I am talking about is setting up the analysis of qualified immunity as it relates to the last two TASER applications. I mean, you're essentially arguing that there wasn't a constitutional violation. And when you say what were they supposed to do, you're saying what they did was right and there was not a constitutional violation. Actually, I'm not, because I'm arguing in the context of qualified immunity and whether or not what they did in that setting was reasonable. And we can look at the legal landscape of cases that exist at that time. And what is very clear, and I think you're exactly right on in observing, Judge Mahan, that there is no case that specifically speaks to this multiple TASER application where the subject is still resisting. He's noncompliant. And there's a lot of time spent on this concept of active versus passive resistance. That is meaningless to a police officer. He is an individual on the ground that will not show his hands, will not comply with repeated, very loud verbal commands to do a particular thing. It is not a safe situation. An officer would give up the distance of safety to approach. Specifically, and this is why I'm frustrated by the lack of a transcript, taking the last two TASERs. This is what I understand the record to be, and you can tell me if I'm right or wrong. He, the new officer arrives on the scene. She tells him to do the opposite of what the other person had told him to do. One's telling him to get in the stomach, the other one's telling him to get in his back. I'll correct that just a little bit, Your Honor. What initially happened is that after the third TASER and the other officer arrived on the scene, Mr. Beaver started to roll to his side and get up on an elbow. At that point, the second officer makes the directive to Officer Laird to TASER him again. And a TASER is applied, and at that point he goes back down flat. I thought first, see this is, it's so ridiculous to be proceeding without being able to read it. But my understanding is that before that happened, he had been told by Officer Laird to get on his back and was told by Officer Castro to get on his stomach or vice versa. I don't remember which. And then the other thing happened. Is that right? I think that's right. There was a verbal command that she made to get on his back immediately overridden by the consistent verbal command that Officer Laird had been making all along. This entire event was 75 seconds, but in the 30-some seconds in the other TASER applications, the consistent verbal command to Mr. Beaver was to lay on your stomach and show me your hands, neither of which he did. But he didn't show his hands, even when he started his hands under him. You are correct. The last TASER application was made at a point where Mr. Beaver was clutched on the ground, noncompliant, and was tightening his hands underneath his body and refusing to show them. From the officer's perspective, the options at that point are limited. It's to use the TASER again because he's still resisting and get him to comply so that they can safely approach. The idea of approaching going hands-on is exactly as you observed. That is the ultimate 20-20 vision of hindsight. What do you think is the closest prior case? The closest prior case, I haven't found a case that has multiple TASER applications where the suspect continues to resist through all TASING. I have not found that case anywhere. He didn't resist. He didn't comply. I mean, he didn't pull his hands out, but at that point he wasn't going anywhere. Well, he was not escaping. The issue for the officer fairly at that point is one of officer safety. And so the questions being posed, he has to get him into custody at some point. They don't have the option of simply walking away from this individual and saying, I appreciate that you're noncompliant. You still won't act in accordance with our request. We're done. We're out of options. So they need to take him physically into custody. So the question at that point, and we're not viewing this with the 20-20 vision of hindsight. We're viewing this from an officer's perspective on the scene at the time that has the benefit of having watched this individual fight through other TASINGS, physically fight through them, attempt to get up, and continue to not comply. The notion that, oh, this was safe for the officer because he was told on dispatch that the person that called in reported not having seen a weapon in his hand, that does not give comfort to police officers. They are trained, and this is in the record. It was observed by Judge Donahue. They are trained to assume that he is safe until they conduct a pat-down search. Why else are pat-down searches conducted? But for officer safety because weapons can be hidden. He also observed correctly that committing a daylight burglary in a house may well have tools of burglary with him that are not visible. So the officer sees this individual, arms clutched underneath. Without getting into this nuance about active versus passive resistance, this individual is not under control, which is the defining point at which officers cannot use force. So you ask me what is the closest case. I haven't found one that speaks to this issue. There is no question that law existed. In fact, there is a lot of discussion of the 1989 decision by this court that talks about you cannot use force to inflict pain or punishment on someone. That has been clearly established, and that is not what we are talking about in this case. So that is as close as it came for any officer in 2004. I think part of the point, and he makes this clear in his opinion, part of the point of Judge Donahue's decision is to identify what he perceives to be the state of the law for future guidance, and he spends some time talking about that. None of the cases that are cited give guidance to any department back in the time frame of 2004, which frankly was fairly new into the use of the taser of the kind we're talking about here. Some of the other cases talk about electric shock weapons. Those aren't the tasers manufactured by taser. In fact, the model here was an M-26, one of the first models. What about Smith v. City of Hammond? I know it's a dog case, but in terms of the position of the suspect in that case, wasn't he already on the ground at that point? I believe he was, Your Honor. That was decided after this event. Oh, that's right. We searched, obviously Judge Donahue searched, and as recently as 2008 we cited a court to the Sanders decision where that judge searched and didn't find a case, and the supplemental decision that was cited to you in the Oliver case, the court there says on page 6 of that opinion that he has searched and has found no case law directly on point. So it defies anything that I found in the research to suggest that there was a case that told an officer in this situation that use of the taser when he continues to be noncompliant was an excessive use of force. I've used my time. Thank you very much. Ms. Horne, you get the last word. Thank you, Your Honor. First of all, I understand that it's helpful to have a case directly on point, but that's not required at all. The U.S. Supreme Court said it is not necessary that the alleged facts have been previously held unconstitutional, as long as the unlawfulness is apparent in light of existing law. The Mitchenfelder v. Sumner case does hold that you cannot use a taser when it is unnecessary. In DeRoyal, I can never pronounce his name, I apologize, DeRoyal v. Rutherford, which involved the lead-filled bean bag, which was less than lethal force. They held that the desire to resolve quickly a potentially dangerous situation does not alone justify use of force that may cause serious injury. A simple statement from the officer that he fears for his safety is not enough. What? There must be objective factors to justify such. The fact that the guy was running away to begin with, is that a justification to taser him? Yes, Your Honor, and we didn't challenge the first tasing. That was the only time he was actually fleeing from a police. He wasn't a threat, necessarily, at that point. He was just running away. No, he's not a threat, but, you know, the case law has shown that if a fleeing felon, a fleeing felon or a fleeing person suspected of a felony. But then the fact that he had been running away is relevant to everything that happened afterwards, because if you think he's about to get up and run away, it's certainly plausible that he's going to start running away again, or he did it once. In part, it's plausible, Your Honor, I agree. It's just that he already had the tasers were firmly embedded in Mr. Beaver's body. He was lying on the ground, rolling around, saying, I can't. He never was, he never got up. The whole incident took, again, you know, one minute and 15 seconds. At times, he was only given two seconds to comply with a request. How can he have been found to be that dangerous for imminently, you know, providing any danger to the police or others in that amount of time? That's just not, to me, as plausible. Additionally, Your Honor, the court here held, I mean, I know we were discussing some of the facts that the court has discussed in the excerpt of record, page 26, on footnote number 8. He says, Officer Laird testified that Mr. Beaver's hands were either visible to him during the incident when he was rolling on his back or were curled underneath his chest when he was on his stomach as commanded. So his hands were always at least somewhat visible to the officer at the time, and it's not something that he had a potential grabbing a weapon and using it against the officers. Thank you, Your Honor. Thank you very much. The case just argued is submitted. Thank you to both counsel. Thank you.
judges: Silverman, Berzon, Mahan